**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GLORIA ESTHER QUINONES PRATT,** | : | **CIVIL ACTION** |
| ***On behalf of A.N.C.Q.,*** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **20-CV-6141** |
| | : | |
| **KILOLO KIJAKAZI,**[1] | : | |
| **Acting Commissioner of Social Security,** | : | |
| **Defendant.** | : | |

## <u>MEMORANDUM OPINION</u>

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                          **7/12/2023**

Plaintiff Gloria Esther Quinones Pratt brought this action on behalf of her minor child,

A.N.C.Q., pursuant to 42 U.S.C. § 405(g), seeking review of the Commissioner of Social

Security Administration's decision denying her claim for Supplemental Security Income ("SSI")

benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-33.  This matter is before me

for disposition upon consent of the parties.  For the reasons set forth below, Plaintiff's Request

for Review (ECF No. 13) is **DENIED**.

## I.      PROCEDURAL HISTORY

Plaintiff protectively filed an application for SSI benefits on September 21, 2017,

alleging that A.N.C.Q. had been disabled since August 16, 2017.  (R. 236-45).  The claim was

denied at the initial level, and Plaintiff requested a hearing before an Administrative Law Judge

("ALJ").  (R. 134-39, 140-45).  Represented by counsel, both Plaintiff and A.N.C.Q. testified

---

[1]  Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021.
Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi has been
substituted for Andrew Saul as the Defendant in this case.

with the assistance of an interpreter at an administrative hearing on February 15, 2019.  (R. 93-123).  On May 17, 2019, the ALJ issued a decision unfavorable to the Plaintiff.  (R. 10-37).  Plaintiff appealed the ALJ's decision, and the Appeals Council denied her request for review on October 9, 2020, thereby making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  (R. 1-9).

On December 4, 2020, Plaintiff filed a complaint in the United States District Court for the Eastern District of Pennsylvania.  (Compl., ECF No. 1).  Plaintiff consented to my jurisdiction pursuant to 28 U.S.C. § 636(c).  (Consent, ECF No. 3).  She filed a Brief and Statement of Issues in Support of Request for Review on April 21, 2022.  (Pl.'s Br., ECF No. 13).  On May 20, 2022, the Acting Commissioner filed a response.  (Def.'s Br., ECF No. 14).

## II.    FACTUAL BACKGROUND

The Court has reviewed the administrative record in its entirety and summarizes here the evidence relevant to the instant request for review.[2]

A.N.C.Q. was born on March 9, 2009, making her nine years old on the date the application was filed.  (R. 236).

### A.    Medical Evidence and School Records

Plaintiff and her family moved to Philadelphia from Puerto Rico in the summer of 2017.  (R. 418).  On September 12, 2017, Esperanza Health Center conducted a behavioral evaluation of A.N.C.Q.  (R. 360-70).  Plaintiff reported that her daughter was hyperactive, did not pay attention, and fought with her sibling.  (R. 367).  The examiner noted that A.N.C.Q. was well

---

[2] According to Plaintiff, "A.N.C.Q. has some physical medical issues," but "it is agreed that they are not disabling."  (Pl.'s Br., ECF No. 13, at 2).  The Court will not address the child's physical impairments at this time.

behaved, and the mental status examination was unremarkable. (*Id.*)  A.N.C.Q. was diagnosed with unspecified behavioral and emotional disorders. (*Id.*).

On September 2, 2017, A.N.C.Q. presented to Cognitive Behavioral Services, Inc. ("Cognitive Behavioral Services") for a comprehensive biopsychosocial evaluation ("CBE"). (R. 416-28).  Plaintiff stated that her daughter, who only speaks Spanish, had problems with hyperactivity, tantrums, fighting with her brother and her classmates, and following instructions. (R. 416, 418).  The child's mental status examination showed normal grooming, normal hygiene, calm behavior, and no perceptual disturbances. (R. 425).  A.N.C.Q. was diagnosed with ADHD. (R. 426-27).  Weekly psychotherapy sessions and monthly psychiatric appointments were recommended. (*Id.*).  A.N.C.Q. returned to Cognitive Behavioral Services for another CBE on October 18, 2017; her mother again reported behavioral problems in school and at home. (R. 429-34).  A.N.C.Q.'s memory skills were impaired, but the results of the mental status examination were otherwise unremarkable. (R. 431, 433).  A diagnosis of ADHD was made, and individual and family therapy as well as pharmacotherapy to reduce the symptoms of ADHD were recommended. (R. 431-32).

Beginning in September 2017, A.N.C.Q. received outpatient medical health treatment at Cognitive Behavioral Services, including both weekly individual psychotherapy sessions and monthly psychiatric medication management appointments. (R. 398-519).  At her therapy sessions, A.N.C.Q. talked about her behavioral issues, feelings of sadness and anger, difficulties in subjects such as mathematics, and problems with showering consistently. (*See, e.g.*, R. 448, 450, 452, 459, 462, 464).  However, the child also indicated that she had two friends and was doing her homework, going on family outings, enjoying her vacation, learning English, studying for tests, watching movies, helping her mother around the house, and was showering more frequently. (*See, e.g.*, R. 437, 439, 450, 457, 459, 464).  A.N.C.Q.'s mental status examination

findings were generally unremarkable, and she was cooperative during her sessions.  (*See, e.g.*, R. 444, 449-60, 468, 481, 483-519).  She could assemble puzzles, play games, and share her experiences and problems.  (*See, e.g.*, R. 444, 484).  The December 27, 2017 psychiatric progress note did show impaired recent and remote memory.  (R. 399).

A.N.C.Q. was enrolled in regular education classes, including English as a Second Language ("ESOL"), at a Philadelphia public school as of September 2017.  (R. 274).  She received passing grades, ranging from As to Ds.  (R. 335, 337, 356).

On November 30, 2017, A.N.C.Q. presented for a child mental status and intelligence evaluation with Brook Crichlow, Psy.D.  (R. 371-82).  Plaintiff reported that her daughter had behavioral challenges and required constant redirection.  (R. 371-72).  A.N.C.Q. was cooperative and comfortable during the evaluation.  (R. 373).  Her mental status examination were normal except for findings of shy yet responsive demeanor, orientation difficulties, impaired attention/concentration, mildly impaired memory, borderline cognitive functioning, and a somewhat limited general fund of memory.  (R. 372-73).  Dr. Crichlow administered the Test of Nonverbal Intelligence, Four Edition ("TONI-4"), which yielded a Toni-4 Quotient of 77, percentile rank of 6, indicating that A.N.C.Q. scored within the poor range of perceptual functioning as compared to her peers.  (R. 374).  Stating that her prognosis was fair given her moderate behavioral difficulties, the psychologist diagnosed unspecified ADHD, unspecified disruptive impulsive control and conduct disorder, and unspecified neurodevelopmental disorder.  (*Id.*).  He recommended that A.N.C.Q. continue to receive mental healthcare services.  (*Id.*).  Dr. Crichlow completed a Childhood Medical/Psychological Source Statement of Functional Abilities ("MSS"), opining that A.N.C.Q. had moderate learning difficulties in the domain of acquiring and using information, moderate focusing and impulse control limitations in the domain of attending and completing tasks, moderate defiance and aggression in the domain of

4

interacting and relating with others, and moderate impulsivity in the domain of caring for herself. (R. 376-78).

David B. Klebanoff, M.D., conducted a pediatric examination on November 30, 2017. (R. 383-91).  Diagnosing ADHD (R. 386), he opined in an accompanying MSS that A.N.C.Q. was age appropriate in acquiring and using information, interacting and relating with others, and caring for herself.  (R. 387-89).  As to her ability to attend and complete tasks, Dr. Klebanoff noted that she had ADHD.  (R 388).

In December 2017, state agency psychologist Paul Taren, Ph.D., and state agency pediatrician Anjana Popat, M.D. opined that A.N.C.Q. had less than marked abilities in the domain of acquiring and using information because she recently moved to the mainland from Puerto Rico, mainly spoke Spanish, was currently being instructed in a regular education setting without an IEP or other specialized services, and had a borderline TONI-IV score.  (R. 128). The state agency consultants similarly opined that her ability to attend to and complete tasks was less than marked because was she was receiving outpatient treatment "with good effect," she was responsive and cooperative at her recent evaluation, and her mental status examination findings were normal except for fluctuating attention, possibly related to "evaluation anxiety."  (R. 129). Dr. Taren and Dr. Popat stated that A.N.C.Q. had no limitations in the domains of interacting and relating with others, moving and manipulating objects, and health and physical well-being.  (*Id.*) As to the domain of caring for herself, they found that her ability was less than marked, noting that, although she was more temperamental than typical at least at home, her examination findings were normal with no history of any abuse or psychiatric admissions, she was socially active with friends, she helped her mother with chores, she did her homework, and she enjoyed reading and other age-typical activities.  (*Id.*)

In January 2018, Esperanza Health Center conducted a physical examination of A.N.C.Q. (R. 548-49).  Plaintiff said that she was doing well on her ADHD medications and that her teachers reported she was hyperactive at school but getting better with medications.  (R. 548).

Licensed psychologist Anne Marie Buck, M.A. conducted a CBE of A.N.C.Q. on February 28, 2018 to assess her behavioral health and service needs, including whether she required school therapeutic services ("STS").  (R. 406-15).  The school counselor referred A.N.C.Q. for an evaluation because of the child's behavioral issues and the problems she had with completing her work.  (R. 406).  Information provided by A.N.C.Q.'s teacher indicated that A.N.C.Q. was not getting her work done, was below grade level in all academic areas, was consistently off task, was non-compliant with directives, and did not get along with her classmates.  (*Id.*).  STS staff observed the child at school for one hour and reported that she was extremely defiant to her teacher, was hyperactive and inattentive, and had poor peer interactions.  (*Id.*).  Plaintiff also informed Ms. Buck that her daughter had a history of behavioral problems, difficulties with her classmates who treat her poorly, and exposure to domestic violence.  (R. 407).  Noting that A.N.C.Q, was an "English language learner" enrolled in an ESOL program, Ms. Buck observed that her poor academic performance could possibly be language related.  (R. 408).  Mental status examination findings were unremarkable, and A.N.C.Q. was cooperative during her examination.  (*Id.*).  The Teacher's Report Form ("TRF") indicated that she had more problems than were typically reported by teachers of girls aged 6 to 11 in the specific areas of social relationships, attention, rule-breaking behavior, and aggression.  (R. 409).  Plaintiff likewise completed the Child Behavior Checklist ("CBCL"), showing more attention problems and rule-breaking behavior than typically reported by parents.  (R. 409-10).  Ms. Buck diagnosed the child with Diagnosing Oppositional Defiant Disorder ("ODD") and ADHD, observing that the child's ADHD was not fully managed with medication, her social skills and academic

performance were poor, and she was not doing her homework.  (R. 411).  She noted as potential

barriers to treatment or psychosocial and contextual factors the language barrier, the ongoing

investigation of possible physical abuse in the household, and a history of exposure to domestic

violence and Plaintiff's depression and anxiety.  (*Id.*).

The clinical psychologist recommended that A.N.C.Q. receive STS Level 2 services,

totaling nineteen hours per week.  (*Id.*).  A "School Based Services Treatment Plan" was

prepared.  (R. 560-68).  A.N.C.Q.'s CANS ("Child and Adolescent Needs and Strengths") score

showed that she had severe needs in the domains of impulsivity/hyperactivity and oppositional

behavior and moderate needs in the domain of anger control.  (R. 562).  The plan noted that

A.N.C.Q was beginning to establish solid therapeutic relationships with STS staff and that she

said she liked school, paid attention to her teacher, did her homework, and read books.  (*Id.*).

On August 14, 2018, Suzanne Kim Chung, Psy.D., conducted another CBE of A.N.C.Q.

(R. 575-79).  The child was cooperative during the evaluation.  (R. 576).  Plaintiff reported that

A.N.C.Q. had behavioral problems, difficulty concentrating, hyperactivity, irritability,

moodiness, increased appetite, mood swings, and poor hygiene.  (R. 575).  The child's teacher

rated her performance in four subjects as far below grade level, and reported that the child was

working slightly harder, behaving slightly more appropriately, learning about average, and was

slightly happier (R. 576).  The teacher completed a TRF checklist indicating that A.N.C.Q. had

more problems than were typically reported for girls aged 6 to 11 in the specific areas of anxiety

or depression, withdrawn or depressed behavior, social relationships, attention, rule-breaking

behavior, and aggression.  (*Id.*).  Similarly, Plaintiff's CBCL showed somatic complaints

together with problems in social relationships, thought, rule-breaking behavior, and aggression.

(R. 577).  Dr. Chung diagnosed ODD and ADHD and identified substantially the same potential

barriers to treatment and psychosocial and contextual factors as Ms. Buck.  (R. 578).  She

recommended that A.N.C.Q. continue to receive Level II STS services.  (*Id.*).

An updated STS treatment plan was implemented in October 2018.  (R 339-54).  As part of the plan, another CANS assessment was conducted, noting some improvement in her CANS scoring, with the child having moderate needs in the domains of impulsivity/hyperactivity, oppositional behavior, and anger control and minimal needs in the domains of conduct and adjustment to trauma.  (R. 341). The updated plan indicated that certain psychosocial and contextual factors, including a lack of English proficiency, contributed to her need for services.  (R. 342).  According to her teacher, A.N.C.Q. was completing her classwork but continued to struggle with her homework.  (*Id.*).

### B.   Non-Medical Evidence

The record also contains non-medical evidence.  Plaintiff completed a Child Function Report for her daughter, indicating that A.N.C.Q.'s impairments affect both her behavior with other people and her ability to take care of her personal needs.  (R. 267-68).  Plaintiff also reported that A.N.C.Q. is not limited in her abilities to communicate and to progress in learning.  (R. 264-65).

At the administrative hearing, A.N.C.Q. testified that she is nine years old and in the fourth grade.  (R. 99, 102).  According to the child, she takes a medication that makes her feel happy and helps her in school.  (R. 100-01).  She likes to play with toys and video games, ride her bike, and go to the park.  (R. 101-02, 104).  She visits her aunt and goes on summer vacations.  (R. 110).  A.N.C.Q. testified that she goes to the school library and likes to read.  (R. 103).  She claimed that she likes school because the teacher treats her well and helps her.  (R. 104).  Her favorite subject is science, she writes poems and letters for her mother, and participates in class and does her homework every night.  (R. 105-107).  She received As in all her classes in her most recent report card.  (R. 105).  A.N.C.Q. admitted that she gets into trouble

at school for pushing and shoving other students.  (R. 107-08).  She also stated that she could

take a bath, get dressed, and brush her teeth by herself.  (R. 108).  She purportedly helps her

mother clean and do the dishes, and sometimes goes to church and to Girl Scout meetings.  (R.

108-09).

      Plaintiff also testified at the administrative hearing, stating that her daughter had been

diagnosed with ADHD.  (R. 111).  She testified that A.N.C.Q. takes Adderall, another

medication to help with anxiety, and a medication to help with sleeping.  (*Id.*).  A.N.C.Q. goes to

therapy once a week and to a psychiatrist once a month.  (R. 112).  According to Plaintiff, the

doses have been increased because A.N.C.Q. and her brother "fight a lot and they're out of

control."  (R. 113).  The medications help to calm A.N.C.Q. down for a short period of time but

then wear off.  (R. 117).  Plaintiff claimed that teachers call her approximately three times a

month and repeatedly tell her when she picks up A.N.C.Q. after school that her daughter fights

with the other girls, has an attitude, and talks back to her teachers.  (R. 113-14, 116-17).

A.N.C.Q. has not been suspended, although "[t]hey have been at the point of suspending her."

(R. 114, 116-17).  According to Plaintiff, she has an IEP and receives special education and other

services at the school.  (R. 119).  "[T]here's a teacher that's always with her or takes her out of

the classroom to help her and always telling her how she should behave.  It's very good."  (*Id.*).

Although she still gets phone calls about A.N.C.Q.'s behavior, the calls have decreased since her

daughter started getting help.  (R. 120).  Plaintiff adds that she has As, Bs, and Cs and receives

assistance with reading.  (R. 121-22).

      Plaintiff explained that, outside of school, A.N.C.Q. and her brother are always fighting.

(*Id.*).  A.N.C.Q. and her brother talk back, do not listen to Plaintiff, and bully other children.  (R.

115, 118).  A.N.C.Q. does her homework, but she also needs help, wants her mother to do the

work for her, and then starts to cry, yell, and throw things on the floor.  (R. 119).  Plaintiff also

testified that A.N.C.Q. paints, writes, and helps her around the home.  (R. 115).  A.N.C.Q. gets along with her aunt who lives on the same block, and they watch television together.  (*Id.*).  She also rides her bike and plays video games, which leads to more fights with her brother.  (R. 120-22).

### III.    LEGAL STANDARD

Under the Social Security Act, the SSA must apply a three-step sequential evaluation process to determine if a child under the age of eighteen is disabled.  20 C.F.R. § 416.924(a).  A child under eighteen is eligible for SSI benefits only if: (1) she is not performing substantial gainful activity; (2) she has a medically determinable impairment or combination of impairments that is severe; and (3) the impairment or combination of impairments meets, medically equals, or functionally equals the severity of one or more of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. § 416.924.

If the child's impairment does not medically meet a listing, the examiner must determine whether the impairment functionally equals a listing.  An impairment or combination of impairments functionally equals a listed impairment if it causes a "marked" limitation in two of six domains of functioning or an "extreme" limitation in one of those six domains.  20 C.F.R. § 416.926(a). [3]  The six domains of functioning are: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1).

---

[3]  A "marked" limitation "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i).  An "extreme" limitation "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i).

Judicial review of a final decision of the Commissioner is limited.  A district court is bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards.  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence is "more than a mere scintilla," and "such relevant evidence as a reasonable mind might accept as adequate."  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118 (3d Cir. 2000) (citations omitted).  Even if the record could support a contrary conclusion, the decision of the ALJ will not be overruled as long as there is substantial evidence to support it. *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).  The court has plenary review of legal issues.  *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

## IV.    ALJ'S DECISION

In her decision, the ALJ made the following findings:

1.    The claimant was born on March 9, 2009.  Therefore, she was a school-age child on September 20, 2017, the date the application was filed, and is currently a school-age child (20 C.F.R. 416.926a(2)(g)).

2.    The claimant has not engaged in substantial gainful activity since September 20, 2017, the application date (20 CFR 416.924(b) and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: attention deficit hyperactivity disorder (ADHD) and oppositional defiant disorder (ODD) (20 CFR 416.924(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5.    The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416a).

11

6.      The claimant has not been disabled, as defined in the Social Security Act, since

September 20, 2017, the date the application was filed (20 CFR 416.924(a)).

(R. 19-33).

Accordingly, the ALJ found Plaintiff was not disabled.  (R. 33).


## V.      DISCUSSION

Plaintiff raises two related claims in her request for remand: (1) given the medical and school records, the ALJ erred as a matter of law and fact in deciding that A.N.C.Q. did not satisfy Part B of Listing 112.08 on the basis of her ODD; and (2) the ALJ committed legal and factual errors by finding that A.N.C.Q. did not satisfy Part B of Listing 112.11 based on her ADHD.  (Pl.'s Statement of Issues, ECF No. 13-1, at 1; Pl.'s Br., ECF No. 13, at 3-18).

Like the ALJ, I consider the two claims together because both listings implicate the same criteria.  (*See* R. 20-33).  The ALJ first considered whether A.N.C.Q.'s impairments, or a combination of her impairments, met or medically equaled the criteria for Listings 112.08 (personality and impulse-control disorders) and Listing 112.11 (neurodevelopmental disorders). (R. 20).  In relevant part, paragraph B of each listing requires proof of: "Extreme limitation of one, or marked of two, of the following areas of mental functioning (see 112.00F): 1. Understand, remember, or apply information (see 112.00E1).  2. Interact with others (see 112.00E2).  3. Concentrate, persist, or maintain pace (see 112.00E3).  4. Adapt or manage oneself (see 112.00E4)."[4]  20 C.F.R. pt 404, subp. P, app. 1, §§ 112.08B, 112.11B.  The ALJ

---

[4]  Plaintiff addresses the paragraph A criteria for the two listings in her brief.  (Pl.'s Br., ECF No. 13, at 3-16).  However, the ALJ determined that a detailed discussion of the paragraph A criteria was not required because A.N.C.Q. did not satisfy the criteria under paragraph B.  (R. 20).  The Acting Commissioner likewise states that a discussion of paragraph A is not necessary. (Def.'s Br., ECF No. 14, at 8 n.7) (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).  Because the ALJ properly disposed of this case under paragraph B, I do not consider paragraph A.

found that A.N.C.Q. had mild limitations in understanding, remembering, or applying information; moderate limitations interacting with others; moderate limitations in concentrating, persisting or maintaining pace; and mild limitations in adapting or managing oneself.  (R. 20-22).

Determining that A.N.C.Q. did not meet or medically equal a listing as a minor, the ALJ next analyzed whether her impairments (or a combination of impairments) functionally equaled the two listings.  (R. 22-33).  Based on the testimony of both A.N.C.Q. and her mother, the medical evidence, and the school records, she found that A.N.C.Q.'s medically determinable impairments could reasonably be expected to cause the alleged symptoms but that the allegations concerning the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical evidence.  (R. 22-26).  Turning to the opinion evidence, the ALJ found persuasive the prior administrative medical findings of Dr. Taren and Dr. Popat concerning A.N.C.Q.'s less than marked limitations in the domains of acquiring and using information, attending and completing tasks, and caring for oneself.  (R. 26).  She also credited their opinion as the lack of any limitation in the domains of moving about and manipulating objects and health and physical well-being.  (*Id.*).  However, the ALJ disagreed with the state agency consultants' opinion that the child had no limitation in the domain of personal interactions, finding that the record supports a less than marked limitation as to this domain.  (R. 26-27).  The ALJ also did not accept Dr. Crichlow's opinion that A.N.C.Q. had moderate limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for oneself.  (R. 27).  She instead agreed with Dr. Klebanoff that A.N.C.Q. was "age appropriate" in the domains of acquiring and using information, interacting and relating with others, moving about and manipulating objects, and caring for oneself.  (*Id.*).  The ALJ then found that A.N.C.Q. had: (1) a less than marked limitation in acquiring and using information; (2) less than a marked limitation in attending and

completing tasks; (3) less than a marked limitation in interacting and relating to others; (4) no limitation in moving about and manipulating objects; (5) less than a marked limitation in the ability to care for herself; and (6) no limitation in health and physical well-being.  (R. 27-33). According to the ALJ, Plaintiff thereby did not have an impairment or combination of impairments that resulted in marked limitations in two domains of functioning or an extreme limitation in one domain of functioning.  (R. 22).

Plaintiff argues that the evidence proves that A.N.C.Q. had an extreme limitation or one or marked limitation of two of the following areas of mental functioning under Listing 112.08: interacting with others and adapting or managing oneself.  (Pl.'s Br., ECF No. 13, at 14).  She also contends that her daughter has an extreme limitation or at least a marked limitation in all four areas of mental functioning under Listing 112.11.  (*Id.* at 16-18).  Plaintiff argues that the ALJ did not consider either the school authorities' ratings or the other evidence of A.N.C.Q.'s high level of hyperactivity, inattention, and aggression.  (*Id.* at 17) (citing R. 25, 31).  Plaintiff also asserts that the ALJ placed too much weight on A.N.C.Q.'s medical visits, her grades, her testimony at the hearing, and the child's treatment goals and objectives instead of focusing on the observations of school personnel, Plaintiff's testimony, and the child's conduct.  (*Id.* at 17-18). In her response, the Acting Commissioner argues that the ALJ fully considered the school records and A.N.C.Q.'s mother's testimony and adequately explained that the record did not support a finding of disability.  (Defs.' Br., ECF No. 14, at 12, 14).  According to the Acting Commissioner, substantial evidence supports the ALJ's findings that A.N.C.Q.'s impairments did not satisfy the paragraph B criteria for either listing, and Plaintiff is asking this Court to re-weigh the evidence, which it cannot do.  (Def.'s Br., ECF No. 14, at 7-15).  I agree with the Acting Commissioner.

A.      The ALJ's Consideration of the Evidence

As a threshold requirement, it is the ALJ's obligation "to hear and evaluate all relevant evidence in order to determine whether an applicant is entitled to disability benefits." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir.1981).  The ALJ must provide "not only an expression of the evidence [she] considered which supports the result, but also some indication of the evidence which was rejected." *Id*. at 705.  This is necessary so that a reviewing court can understand the basis of the ALJ's decision and determine whether the decision was proper.  *Id*. at 707.  The duty to develop the record does not require the ALJ to refer to every piece of evidence submitted.  *See Black v. Apfel*, 143 F.3d 383, 386 (8th Cir.1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered."); *see also Phillips v. Barnhart*, 91 F. App'x. 775, 780 n.7 (3d Cir.2004) (agreeing with the Eighth Circuit in *Black*).  Accordingly, the ALJ need not discuss "every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  Rather, the ALJ's opinion "read as a whole [must] illustrate [] that the ALJ considered the appropriate factors in reaching [her] conclusion." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004).

According to Plaintiff, the ALJ failed to take into consideration the school authorities' ratings and disregarded evidence of A.N.C.Q.'s hyperactivity, inattention, and aggression.  (Pl.'s Br., ECF No. 13, at 17).  However, in her narrative summary of the evidence, the ALJ reviewed the testimony provided by Plaintiff and A.N.C.Q. herself and the medical records from Esperanza Health Center, Cognitive Behavioral Services, and Dr. Crichlow.  (*See* R. 23-25).  She also summarized the school records, including the child's report cards.  (*See* R. 23-26). Specifically addressing the February 2018 CBE conducted by Ms. Buck to determine whether A.N.C.Q. required STS services, the ALJ observed that the evaluation was conducted because of a referral from the child's school counselor who reported that the child fought with her peers and

siblings and had problems with finishing schoolwork. (R. 25) (citing R. 406). According to the ALJ, similar problems were reported to Ms. Buck by the teacher, the STS staff, and Plaintiff herself. (*Id.*) (citing R. 406-08). The ALJ also recognized in connection with the August 2018 CBE that Plaintiff reported that A.N.C.Q. had already been suspended twice and had problems interacting with others, roaming around the school, difficulty concentrating, hyperactivity, irritability, and mood swings. (*Id.*) (citing R. 576). Similarly, the ALJ observed that the teacher rated A.N.C.Q. as far below grade level in four subjects, but also reported that the child was working slightly harder, behaving slightly more appropriately, learning about average, and was slightly happier than typical students of the same age. (R. 25-26) (citing R. 576). Furthermore, it was recognized that the rating scales completed by Plaintiff and A.N.C.Q.'s teacher indicated that A.N.C.Q. had more problems than typically reported by parents or teachers of girls her age in the areas of anxiety/depression, social relationships, attention, rule-breaking, and aggression. (R. 26) (citing R. 576-77).

With respect to the specific criteria under paragraph B, the ALJ likewise considered all the relevant evidence, including both the school ratings and records and Plaintiff's observations about her child, and provided an adequate explanation for determining that none of A.N.C.Q.'s impairments met the applicable criteria, *see, e.g.*, *Cotter*, 642 F.2d at 700, 704-05. In fact, the ALJ relied on Plaintiff's testimony and the school records to find that the child did not have an extreme or marked limitation in any of the four areas of mental functioning. (R. 20-22).

Plaintiff specifically disputes the ALJ's finding that A.N.C.Q. had only a moderate limitation in the area of interacting with others. (Pl.'s Br., ECF No. 13, at 17). However, the ALJ explicitly acknowledged that A.N.C.Q. was receiving STS services. (R. 21). She also considered the school records and Plaintiff's testimony at the administrative hearing, which indicated that the child continued to have significant behavioral issues despite her improvement

in the classroom setting. (*Id.*) (citing R. 93-123, 335-36, 339-54, 355-56, 406-15, 575-79). Based on the same school records, the ALJ found that there were several contextual factors contributing to A.N.C.Q.'s problems, including a language barrier, exposure to domestic violence and possible physical abuse, and maternal mental health issues. (*Id.*) (citing R. 341-42). She also found that the A.N.C.J. was cooperative when testifying at the administrative hearing and at her treatment sessions with Cognitive Behavioral Services. (*Id.*) (citing R. 416-519). It was noted that she was also cooperative at the November 2017 child mental and intelligence consultative examination and the findings of her examination were generally unremarkable. (*Id.*) (citing R. 372-73).

Additionally, the ALJ noted Plaintiff's testimony that her daughter has an IEP and receives support services for reading at school. (R. 20) (citing R. 93-123). But the ALJ determined that A.N.C.Q. had a mild limitation in understanding, remembering, or applying information because Plaintiff also testified that A.N.C.Q. receives passing grades. (*Id.*) (citing R. 93-123). In addition, the ALJ pointed out that the family had moved to the mainland from Puerto Rico in June 2017. (R. 20) (citing R. 406-15). The ALJ acknowledged that A.N.C.Q. exhibited mildly impaired memory skills, borderline cognitive functioning, and somewhat limited general fund of information at the November 2017 examination and scored within the poor range of perceptual functioning on her TONI-4 test. (R. 20-21) (citing R. 371-82). Given the subsequent improvement in A.N.C.Q.'s mathematics grades, the ALJ reasoned that it was her recent relocation that partially caused her inability to perform calculations in her November 2017 assessment. (R. 20-21) (citing R. 336-37, 355-56, 373-74). Citing both the report cards and the October 2018 supplemental STS plan, the ALJ observed that the record reflected that the child participated in regular education and ESOL classes and that she improved upon and maintained her passing grades (R. 21) (citing R. 335-38, 348, 355-56).

As to her finding of a moderate limitation in concentration, persistence, and maintenance of pace, the ALJ acknowledged Plaintiff's testimony that A.N.C.Q. takes medication for ADHD, which provides temporary relief, and that she requires redirection to complete her homework. (*Id.*) (citing R. 93-123).  However, the ALJ noted that A.N.C.Q.'s attention and concentration were intact at her October 2017 evaluation and that the child could focus during her mental health treatment sessions, as demonstrated by her ability to play games and assemble puzzles and share her weekly experiences.  (*Id.*) (citing R. 416-519).  The ALJ acknowledged that A.N.C.Q.'s attention and concentration were impaired at the November 2017 examination, but she added that the child could still count, her speed of responding was deliberate, and her inability to perform calculations at that time could have been due to her recent arrival given the improvement in her subsequent mathematics grades.  (*Id.*) (citing R. 373, 335-36, 355-56).  Furthermore, the ALJ recognized that A.N.C.Q. was receiving STS services targeted at improving her attentive and on-task behaviors and that the services were helping given the fact that she improved upon and then maintained passing grades in her classes.  (*Id.*) (citing R. 335-54).

Finally, the ALJ found that the child was mildly limited in the area of adapting or managing oneself.  (R. 22).  According to the ALJ, Plaintiff testified that A.N.C.Q. engaged in disruptive behavior.  (*Id.*) (citing R. 93-123).  But she explained that the evidence showed that the child's emotional regulation improved because of the therapy and STS services she received.  (*Id.*) (citing R. 93-123, 339-54, 406-519, 575-79).  The ALJ additionally stated that A.N.C.Q. recognized her issues with bathing and began to work on improving them and that her mental status examination findings showed appropriate appearance, fair insight, and fair judgment.  (*Id.*) (citing R. 366-67, 372-73, 399, 402, 408, 416-519, 524, 536, 543-44, 552, 571, 576).

**B.      Substantial Evidence**

A district court is bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards.  *Hartranft*, 181 F.3d at 360.  The Third Circuit has instructed, "A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores or fails to resolve a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence . . . or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).  Thus, the substantial evidence standard embraces a qualitative review of the evidence, and not merely a quantitative approach. *Id.*; *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981).

It is not the role of the Court to re-weigh the evidence of record or substitute its own conclusions for that of the ALJ.  *See e.g., Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002). If the ALJ's conclusion is supported by substantial evidence, this Court may not set aside the Commissioner's decision, even if it would have decided the factual inquiry differently. *Hartranft*, 181 F.3d at 360 (emphasis added).  Although there may be other evidence in the record that could support a finding in favor of the claimant, "our inquiry is not whether the ALJ could have reasonably made a different finding based on this record."  *Simmonds*, 807 F.2d at 58.

"The new regulatory scheme [applicable to claims filed on or after March 27, 2017] instructs that the ALJ 'will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s), including those from [the claimant's] medical sources.'"  *Cheryl F. v. Kijakazi*, No. 3:20-cv-16052, 2022 WL 17155681, at *10 (D.N.J. Nov. 22, 2022) (citing 20 C.F.R. § 404.1520c(a)).  Under this new scheme, the ALJ must evaluate the persuasiveness of the opinion, whether from a treating source or not, pursuant to the five factors set forth in 20 C.F.R. § 404.1520c(c).  *See Lawrence v.*

19

*Comm'r of Soc. Sec.*, No. 3:21-cv-01239, 2022 WL 17093943, at \*4 (M.D. Pa. Nov. 21, 2022) ("Rather than assigning weight to medical opinions, [an ALJ] will articulate how persuasive he or she finds the medical opinions.") (citations and quotations omitted).  Among these five factors, supportability and consistency are the "most important."  20 C.F.R. §§ 404.1520c(b)(2); *accord Lawrence*, 2022 WL 1709343, at \*10.  "Therefore, [the ALJ] will explain how [he or she] considered the supportability and consistency factors for a medical source's medical opinions . . . in [the] determination or decision . . . ."  20 C.F.R. §§ 404.1520c(b)(2).

Turning to the paragraph B criteria, I conclude that the ALJ's finding that A.N.C.Q. had only a mild limitation in understanding, remembering, or applying information is supported by substantial evidence.  This evidence, including her school records and Plaintiff's hearing testimony, indicated that A.N.C.Q. was earning passing grades, was enrolled in regular education and ESOL classes, and improved her math grades.  (R. 20, 121, 348, 356).  Next, the ALJ's finding that A.N.C.Q. had a moderate limitation in interacting with others is supported by the child's cooperative attitude and generally normal behavior at the hearing and her regular treatment sessions with Cognitive Behavioral Services.  (*See, e.g.*, R. 21, 116-17, 444, 449-60, 468, 481, 483-519).  At her November 2017 child mental status and intelligence consultative examination, A.N.C.Q. likewise presented as cooperative with appropriate eye contact, normal speech, euthymic mood, and no signs of emotional distress.  (R. 21, 372-73).  As the ALJ noted in her factual summary of the August 2018 CBE, her teacher also reported that the child was behaving slightly more appropriately.  (R. 25, R. 576).  The ALJ's finding that A.N.C.Q. was moderately restricted in maintaining concentration, persistence, and pace is supported by several mental status examinations showing that she had intact concentration and attention and that she could both count and count backwards from 20.  (*See, e.g.*, R. 21, 372-73, 431, 433, 444, 484).  A.N.C.Q.'s school records also established that she was receiving STS services focused on

improving her attention and on task behaviors in to help her complete school assignments and that she was maintaining passing grades in her classes.  (*See, e.g.,* R. 21, 335-38, 342, 347, 356). In fact, the ALJ pointed out in her narrative summary of the record that the updated October 2018 STS treatment plan indicated that, according to the claimant's teacher, A.N.C.Q. was completing her classwork.  (R. 26) (citing R. 349).  Turning to the final area of functioning, substantial evidence supports the ALJ's finding that A.N.C.Q. had only a mild limitation in adapting or managing herself.  (R. 22).  The record indicated that her treatment had some beneficial effect in helping her regulate her emotions in an age-appropriate manner, she had recognized her issues with consistent bathing and began to work on improvement, and her mental status examinations showed appropriate appearance, fair insight, and fair judgment.  (*See, e.g.*, R. 22, 339-67, 373-73, 399, 402, 408, 416-519, 524, 536, 543-44, 552, 571, 575-79).

Plaintiff argues that the evidence, specifically the medical evidence, her own concerns about her daughter, and the school records, demonstrates that A.N.C.Q. had extreme or marked limitations in the areas of interacting with others and adapting or managing herself for purposes of Listing 112.08 and, at a minimum, either an extreme limitation in one or marked limitations in two of the four areas of mental functioning under Listing 112.11.  (Pl.'s Br., ECF No. 13, at 14, 16-18).  According to Plaintiff, the ALJ erred by focusing on her medical visits, which were short in duration and occurred in a strictly therapeutic setting, instead of placing more weight upon the observations of school personnel, who often spend more time with students than their parents and regularly have to address inappropriate behaviors.  (*Id.* at 17) (citing R. 21).  She similarly indicates that that the ALJ placed too much weight on A.N.C.Q.'s grades, the child's testimony, and the school district's treatment goals and objectives.  (*Id.* at 17-18).  Although Plaintiff cites evidence that might have supported a finding of extreme or marked limitations under paragraph B (*see id.*), this fact alone is not a basis for remand because substantial evidence

21

supports the ALJ's findings that A.N.C.Q. did not have an extreme or marked limitation in any of the applicable areas of mental functioning.  *See, e.g., Simmonds,* 58 F.2d at 58 ("While there is other evidence in the record that could support a finding of disability . . ., our inquiry is not whether the ALJ could have reasonably made a different finding based on this record.  Rather, we must review whether the ALJ's actual findings are supported by substantial record evidence.").  I am "not permitted to weigh the evidence or substitute [my] conclusions for that of the [administrative] fact-finder."  *Burns*, 312 F.3d at 118 (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

In this case, the ALJ appropriately weighed all the evidence, including the child's grades, the ratings and observations made by school staff, the treatment goals and objectives, the medical examinations, and the observations of her mother. As I have explained in Section V.A., the ALJ relied on both the school records and Plaintiff's testimony to find that A.N.C.Q.'s impairments did not meet paragraph B.  The ALJ specifically acknowledged that there were some abnormal behaviors noted in the school records, but she then reasonably observed that many of the same observations are repeated in the various documents despite evidence of A.N.C.Q.'s improvement within the classroom setting.  (R. 21) (citing R. 335-36, 339-54, 355-56, 406-15, 575-79).  The ALJ similarly recognized that, according to Plaintiff's hearing testimony, A.N.C.Q. receives STS service and has several significant behavioral issues, problems with adapting or managing herself, and difficulties with learning and concentration.  (R. 20-22) (citing R. 93-123).  She properly weighed the mother's concerns against  evidence showing that A.N.C.Q. benefited from therapy, STS, and ESOL classes, was cooperative at the administrative hearing, the November 2017 examination, and her treatment sessions, and had generally normal mental status findings. (*Id.*) (citing R. 91-123, 335-56, 366-67. 372-74, 399, 399, 402, 406-519, 524, 536, 543-44, 552, 571, 576).

Plaintiff also suggests that A.N.C.Q.'s medical treatment was substandard and rushed and that she did not have any friends.  (Pl.'s Br., ECF No. 13, at 17-18).  However, she does not cite to any evidence to support either suggestion.  In fact, A.N.C.Q. underwent five separate psychological examinations over the course of approximately one year, including a behavioral health evaluation at Esperanza Health Center, a comprehensive biopsychosocial evaluation at Cognitive Behavioral Services in September 2017, an October 2017 psychiatric evaluation at Cognitive Behavioral Services, a consultative child mental status and intelligence evaluation conducted by Dr. Crichlow in November 2017, a February 2018 comprehensive biopsychosocial evaluation by Ms. Buck, and a comprehensive biopsychosocial reevaluation conducted by Dr. Chung in August 2018.  (*See* R. 20-22, 24-26, 371-82, 406-28, 429-34, 575-79).  A.N.C.Q. also continued to receive outpatient mental health treatment at Cognitive Behavioral Services, consisting of both weekly individual psychotherapy sessions and monthly psychiatric medication management appointments.  (R. 416-519).  As to her lack of friends, Plaintiff does not cite to any evidence stating that A.N.C.Q. did not have any friends; she instead merely claims that no teacher or STS staffer reported that she had a friend.  (Pl.'s Br., ECF No. 13 at 6-7).  A.N.C.Q. testified that she does have friends at school, and Plaintiff also informed the school that her daughter had one close friend and saw other friends one or two times a week outside of school hours.  (R. 107, 348).

The medical opinions provide additional support for the ALJ's findings of no extreme or marked limitations.  (R. 26-27).  The ALJ found persuasive Dr. Klebanoff's opinion that A.N.C.Q. was "age appropriate" in the domains of acquiring and using information, interacting and relating with others, and caring for oneself.  (R. 27) (citing R. 387-89).  She also agreed with the prior administrative medical findings of Dr. Taren and Dr. Popat concerning A.N.C.Q.'s "less than marked limitations" in the domains of acquiring and using information, attending and

completing tasks, and caring for oneself.  (R. 26) (citing R. 128-29).  Additionally, Dr. Crichlow merely opined that A.N.C.Q. had moderate limitations in the functional equivalence domains; he did opine that any limitation rose to the level of an extreme or even a marked limitation.  (R. 376-78).  In fact, no physician or psychologist has opined that the child had an extreme or marked limitation in any area or domain of mental functioning.

Finally, Plaintiff contends that A.N.C.Q.'s testimony concerning her interactions with others is not credible, especially when compared to the school records.  (Pl.'s Br., ECF No. 13, at 17).  The ALJ is empowered to evaluate and determine the credibility of witness testimony and will consider all evidence when making her decision.  *See, e.g.*, 20 C.F.R. § 416.924a(a); DSR 09-2p; *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000).  As detailed above, the ALJ properly considered all the evidence in the record and explained why she found that this evidence did not support a finding that A.N.C.Q. satisfied the criteria of Listings 112.08 and 112.11.  Thus, substantial evidence, including the school records, supports the ALJ's findings of fact.

## VI.    CONCLUSION

For the reasons set forth above, Plaintiff's request for review is **DENIED**.  An appropriate Order follows.

BY THE COURT:

  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge